J-A13044-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

IN RE: ADOPTION OF C.M.T.C.      :    IN THE SUPERIOR COURT OF
                                         :          PENNSYLVANIA
                                           :
                                           :
                                           :
                                           :
                                           :

APPEAL OF: M.C. AND C.C.       :
                                           :       No. 81 WDA 2018

Appeal from the Order December 4, 2017
in the Court of Common Pleas of Westmoreland County,
Orphans' Court at No(s): 8 of 2017

BEFORE: OLSON, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:            FILED JULY 25, 2018

M.C. ("Father") and his wife, C.C. ("Stepmother") (collectively, the "Appellants"), appeal from the Order denying their Petition seeking to involuntarily terminate the parental rights of H.C. ("Mother") to her minor, male child with Father, C.M.T.C. (the "Child") (born in December 2007), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), and (b). We affirm.

On January 18, 2017, Appellants filed a Petition to involuntarily terminate Mother's parental rights to Child (hereinafter the "TPR Petition"). The trial court held a hearing (hereinafter the "termination hearing") on the TPR Petition on October 19, 2017. At that hearing, Child appeared, represented by legal counsel and separate counsel as his guardian ad litem ("GAL"). Both Child's legal counsel and his GAL questioned Child regarding

his preferred outcome and best interests, as did the trial court.[1]  Father and Stepmother appeared, represented by counsel, and testified on their own behalf.  Stepmother's father, D.W., also testified on Appellants' behalf, as did Father's friend, D.C.  Counsel for Appellants also presented the testimony of T.C., who is Child's maternal grandfather.  Mother appeared and testified on her own behalf.  Mother also presented the testimony of A.H., her mother,[2] and B.R., her counselor at her place of residence, New Life for Girls (hereinafter "New Life"), a Bible-based halfway house located in Maryland.

Based on the evidence adduced at the termination hearing, the trial court set forth the relevant factual background and procedural history of this

_____

[1] In In re Adoption of L.B.M., 161 A.3d 172 (Pa. 2017) (plurality), our Supreme Court held that 23 Pa.C.S.A. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding.  L.B.M., 161 A.3d at 180.  The Court defined a child's legal interest as synonymous with his or her preferred outcome.  Id. at 174.  However, the L.B.M. Court did not overrule this Court's holding in In re K.M., 53 A.3d 781, 788 (Pa. Super. 2012), that a GAL who is an attorney may act as counsel pursuant to section 2313(a), so long as the dual roles do not create a conflict between the child's best interests and legal interest.  In the instant case, the trial court appointed separate counsel to represent Child as his legal counsel and his GAL.  Cf. In re T.M.L.M., 2018 PA Super 87 at 4 (Pa. Super. 2018) (in a mother's appeal from an order terminating her parental rights to her six-year-old child, remanding for further proceedings where the child's preference was equivocal and the sole attorney appointed to represent the child neglected to interview him to determine whether his legal and best interests were in conflict).

[2] We will hereinafter collectively refer to Mother's parents, T.C. and A.H., as "Maternal Grandparents."

appeal, and made findings,[3] in its Pa.R.A.P. 1925(a) Opinion, which we incorporate as though fully set forth herein. See Trial Court Opinion, 2/2/18, at 1-4.[4]

On December 4, 2017, the trial court entered an Order denying the TPR Petition. Appellants thereafter timely filed a Notice of Appeal, along with a Pa.R.A.P. 1925(b) Concise Statement of errors complained of on appeal. The trial court then issued its Rule 1925(a) Opinion.

Appellants now present the following issues for our review:

I. [Whether] the trial court's denial of Appellant[s'] request for the termination of Mother's parental rights under 23 Pa.[]C.S.A. [§] 2511[](a)[](1) was error because the evidence shows that Mother engaged in no parental duties whatsoever in the six months prior to the filing of the [TPR] [P]etition[,] since writing [] letter(s) to [] [C]hild from jail, speaking to him from the jail via phone occasionally up until September 2016, and calling [] [C]hild one time [i]n December [] 2016 to wish him happy birthday[,] are not "parental duties" as defined by case law and statute[?]

II. [Whether] the trial court errored [sic] in denying Appellant[s'] request to terminate the parental rights of [Mother] under 23 Pa.C.S.A. [§] 2511(a)(2) because the evidence shows that [Mother's] refusal to perform parental duties are [sic] ongoing and will not be remedied[?]

_____

[3] Our review discloses that the trial court's findings are supported by competent evidence in the record.

[4] To the extent that the trial court states, in paragraph 11 of its Opinion, that Father offered to enter into an "Act 101 agreement," the Act in question, codified at 23 Pa.C.S.A. §§ 2731-2742, provides biological parents, who voluntarily relinquish their parental rights to their children, the potential ability to remain a part of their children's lives after the children have been adopted, in certain circumstances.

Brief for Appellants at 4 (capitalization omitted).[5]

We begin our analysis by observing that

the right to conceive and raise one's children has long been recognized as one of our basic civil rights. In any context, the complete and irrevocable termination of parental rights is one of the most serious and severe steps a court can take. Realizing the significance of such a decision, [the Pennsylvania Supreme] Court adheres to the view that the trial court is in the best position to determine credibility, evaluate the evidence, and make a proper ruling. The trial court's findings in a termination proceeding[,] which are supported by evidence of record[,] are entitled to the same weight given a jury verdict and must be sustained unless the court abused its discretion or committed an error of law. It is well-established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence,

_____

[5] Appellants set forth their issues somewhat differently in their Rule 1925(b) Concise Statement and their Statement of Questions Involved portion of their brief. We, nevertheless, deem their challenges to the trial court's determination that there was insufficient evidence to terminate Mother's parental rights under subsections 2511(a)(1) and (a)(2) preserved. However, Appellants have waived any challenge to the denial of their TPR Petition in relation to section 2511(b), for failing to raise a challenge to the sufficiency of the evidence under section 2511(b) in their Concise Statement and Statement of Questions Involved section of their brief. See In re M.Z.T.M.W., 163 A.3d 462, 466 (Pa. Super. 2017) (citing Krebs v. United Ref. Co. of Pa., 893 A.2d 776, 797 (Pa. Super. 2006) (holding that an appellant waives issues that are not raised in both his or her Rule 1925(b) concise statement and the statement of questions involved portion of his or her brief on appeal)); see also In re W.H., 25 A.3d 330, 339 n.3 (Pa. Super. 2011) (stating that "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." (citation omitted)). Nevertheless, we need not review whether the requirements of section 2511(b) have been satisfied unless the requirements of section 2511(a) have first been satisfied. See In re Adoption of C.L.G., 956 A.2d 999, 1009 (Pa. Super. 2008) (en banc); see also M.Z.T.M.W., 163 A.3d at 466 n.3.

in light of the totality of the circumstances, clearly warrants the involuntary termination.

In re R.I.S., 36 A.3d 567, 572 (Pa. 2011) (citations omitted).

Our Supreme Court has further explained that

there are clear reasons for applying an abuse of discretion standard of review in these cases. ... [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing[,] and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead[,] we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

In re Adoption of S.P., 47 A.3d 817, 826-27 (Pa. 2012) (citations omitted).

The burden is on the petitioner to prove, by clear and convincing evidence, that the asserted grounds for seeking the termination of parental rights are valid. In re R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). "The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." Id. (citation and internal quotation marks omitted).

Here, the TPR Petition sought the termination of Mother's parental rights under section 2511(a)(1), (a)(2), and (b), which provide as follows:

§ 2511. Grounds for involuntary termination

(a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent[,] by conduct continuing for a period of at least six months immediately preceding the filing of the petition[,] either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

> * * *

(b) Other considerations.--The court[,] in terminating the rights of a parent[,] shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (a)(2), (b).

With respect to subsection 2511(a)(1), our Supreme Court has stated

as follows:

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1988). Concerning the element of a parent's settled purpose to relinquish a parental claim, this court has explained that a petitioner must show that the parent "made a deliberate decision to terminate the parent-child relationship throughout the six-month period." *Adoption of M.S.*, 664 A.2d 1370, 1373 (Pa. Super. 1995). Moreover,

> the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.*, 856 A.2d 847, 854-55 (Pa. Super. 2004) (citations omitted).

> "Parental duty" is defined as follows:
>
> There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty[,] which requires affirmative performance. ... Because a child needs more than a benefactor, parental duty requires that a parent exert h[er]self to take and maintain a place of importance in the child's life. Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship.

*Id.* at 855 (citations, quotation marks, and paragraph breaks omitted).

> However, this Court has emphasized that

[w]here a non-custodial parent is facing termination of his or her parental rights, the court must consider the non-custodial parent's explanation, if any, for the apparent neglect, including situations in which a custodial parent has deliberately created obstacles and has[,] by devious means[,] erected barriers intended to impede free communication and regular association between the non-custodial parent and his or her child.

Id. at 855-56; see also Adoption of M.S., 664 A.2d 1370, 1374 (Pa. Super. 1995) (stating that "[w]here a parent makes reasonable attempts to overcome obstacles created by the party seeking to terminate parental right, a mere showing that the parent could conceivably have pursued legal action more promptly cannot justify termination of parental rights." (citation, emphasis, and quotation marks omitted)); accord In re Adoption of B.D.S., 431 A.2d 203, 208 (Pa. 1981) (warning that "obstructive behavior on the part of the custodial parent aimed at thwarting the other parent's maintenance of a parental relationship will not be tolerated, and certainly will not provide a sound basis for the involuntary termination of parental rights."). "The pertinent inquiry is not the degree of success a parent may have had in reaching the child, but whether, under the circumstances, the parent has utilized all available resources to preserve the parent-child relationship." In re Shives, 525 A.2d 801, 803 (Pa. Super. 1987).

Our Supreme Court has set forth our inquiry under subsection 2511(a)(2) as follows:

[Section] 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his

physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." ...

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

In re Adoption of S.P., 47 A.3d at 827 (citations omitted). "Unlike subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." In re E.A.P., 944 A.2d 79, 82 (Pa. Super. 2008) (citation omitted).

Here, Appellants summarize their challenge to the trial court's determination that they had failed to present clear and convincing evidence that subsections 2511(a)(1) and (a)(2) had been met, stating as follows:

The facts of this unfortunate case demonstrate that Mother, for a period of at least 6 months prior to the filing of the [TPR] [P]etition, failed to perform parental duties. Making a phone call from prison and speaking to the [C]hild solely because he "happened" to be there[, i.e., Maternal Grandparents' home,] when [Mother] called, coupled with writing letters whenever she was in prison (but doing nothing when she was out of jail) cannot possibly rise to the level of the performance of parental duties.

The complete refusal of Mother to perform parental duties has not been remedied either. Mother resides in a controlled

environment[, i.e., New Life,] where she is not permitted to leave the facility without constant supervision. She has no opportunity to turn back to drug use and she faces re-incarceration if she even leaves the [] New Life ... halfway house without permission and accompaniment. Mother's sobriety has not been tested outside of the four walls of a facility where she must stay, as a condition of her release from prison. Mother does not work for a living and, therefore, provides no financial support for the [C]hild to this day. She never has. To make matters worse, Mother has no intentions of leaving the [New Life] facility and [has] no future plans to return to the area where the [C]hild lives. Mother is content to live in another state, away from the [C]hild, with no ambition to live life outside of government control or to provide for the [C]hild's financial, physical, emotional, or social needs.

The parental rights of Mother should have been terminated under 23 Pa.C.S.A. [§] 2511(a)(1) and (a)(2) because Mother has refused to perform any parental duties for the [C]hild in 3 ½ years[,] and because her refusal is ongoing. Mother still has made no efforts to see the [C]hild and still allows Father and Stepmother to provide for every single need that the [C]hild has. The [C]hild desperately wants to be adopted by Stepmother[,] as there is a very strong bond between them.

Brief for Appellants at 32-33. Additionally, Appellants argue that the trial court "erroneously found that Father prevented [] contact [between Mother and Child], [and] no witnesses in the case testified that Mother ever tried to see the [C]hild. ... There was nothing to prevent because Mother simply disappeared[.]" Id. at 43 (emphasis omitted).

In its Rule 1925(a) Opinion, the trial court thoroughly recited its reasons for rejecting Appellants' claim that termination was inappropriate under subsections 2511(a)(1) and (a)(2), which we incorporate as though fully set forth herein. See Trial Court Opinion, 2/2/18, at 4-9, 9-10. In sum, the court determined that

(1)     Mother's "regular and consistent" efforts to contact Child, within the six months prior to the filing of the TPR Petition, did not evidence that she had a settled purpose to relinquish her parental claim or fail to perform parental duties (though she could have done more to protect her relationship with Child);

(2)     Appellants actively sought to prevent Maternal Grandparents from facilitating any contact between Child and Mother while Child was in their care;

(3)     Father exhibited a longstanding history of thwarting Mother's direct contact with Child;

(4)     Mother credibly testified that she had overcome her drug addiction and improved her condition considerably;

(5)     Mother knew and reasonably relied upon the fact that Child would be well cared for by Appellants, and that she would be able to maintain her relationship with Child (via Maternal Grandparents) while she recovered;

(6)     "the conditions or causes of Mother's previous incapacity, abuse, neglect or refusal have been remedied and the only parental refusal has been on the part of Father to allow Mother contact with the Child."

See id.; see also Trial Court Opinion and Order, 12/4/17, at 8 (stating that Mother professes no desire to disrupt Child's present life with Appellants, but rather, merely seeks to maintain her, and Maternal Grandparents', connection with Child).

After a careful review of the record, we discern no error or abuse of the trial court's discretion in concluding that Appellants have failed to meet their evidentiary burden necessary to terminate Mother's parental rights under subsections 2511(a)(1) and (a)(2). See, e.g., In re Adoption of L.J.B., 18 A.3d 1098, 1122-23 (Pa. 2011) (holding that the trial court erred in

terminating a mother's parental rights under subsection 2511(a)(1), despite her relocation to Tennessee and failure to contact the child within 6 months of the filing of the termination petition, where the custodial father and stepmother had erected multiple obstacles preventing mother from contacting child, and stating that "where the custodial parent has prevented the parent whose rights are subject to termination from performing parental duties, parental performance is to be measured in light of what reasonably would be expected of an individual in similar circumstances, giving due consideration to obstacles encountered."); see also In re I.G., 939 A.2d 950, 953, 954 (Pa. Super. 2007) (reversing the trial court's order that involuntarily terminated father's parental rights to his children pursuant to, inter alia, subsections 2511(a)(1) and (a)(2), where (a) despite Father's incarceration, he "made efforts to maintain a place of importance in his children's lives[;]" (b) "this is not the case of a Father who simply doesn't care[;]" and (c) there was no clear and convincing evidence for the court to "simply assume that Father's current incapacity [to parent the children] cannot or will not be remedied."). Moreover, we cannot accept Appellants' invitation to reweigh the evidence or re-assess the credibility of the witnesses at the termination hearing, which was solely within the province of the trial court. See In re R.I.S., supra; see also In the Interest of R.J.T., 9 A.3d 1179, 1190 (Pa. 2010) (emphasizing that even if an appellate court would have reached a different conclusion based on the cold record of a case, we may not re-weigh the evidence and the credibility determinations of the trial court). Thus, we will

not disturb the trial court's refusal to terminate Mother's parental rights to Child pursuant to subsections 2511(a)(1) and (a)(2), and neither of Appellants' issues entitle them to relief.

Next, even if Appellants had not waived their challenge to the sufficiency of the evidence to terminate Mother's parental rights to Child under section 2511(b), see n.5 supra, we would nevertheless have determined that it lacked merit. Concerning section 2511(b), our Supreme Court has explained as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." In re K.M., 53 A.3d 781, 791 (Pa. Super. 2012). In In re E.M., 620 A.2d [481,] 485 [(Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. In re K.M., 53 A.3d at 791.

In re: T.S.M., 71 A.3d 251, 267 (Pa. 2013); see also In re Z.P., 994 A.2d 1108, 1121 (Pa. Super. 2010) (explaining that, when evaluating a parental bond, "the court is not required to use expert testimony. … Additionally, section 2511(b) does not require a formal bonding evaluation.") (internal citations omitted).

In its Opinion, the trial court concisely explained its reasons for determining that Appellants had failed to prove, by clear and convincing evidence, that termination would promote the needs and welfare of Child

under section 2511(b). See Trial Court Opinion, 2/2/18, at 8-9 (finding that termination of Mother's parental rights is not in Child's best interests, particularly where Appellants had deliberately thwarted any relationship between Mother and Child, and it would strip Child of his beneficial relationships with Mother and Maternal Grandparents). We incorporate the court's analysis, which is supported by the record, as though fully set forth herein. See id.; see also N.T., 10/19/17, at 233-34 (wherein Child's legal counsel explained to the court that, although Child's position at the time of trial was that he was not bonded with Mother and wished to be adopted by Stepmother, only a few months prior to trial, Child had a wholly different position, which "was more predisposing to re-establishing and maintaining a relationship with [] [M]other.").

As we discern no abuse of the trial court's discretion, we will not disturb its refusal to terminate Mother's parental rights to Child and, therefore, affirm the Order denying the TPR Petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/25/2018

- 14 -

## IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY
## COMMONWEALTH OF PENNSYLVANIA
## ORPHANS' COURT DIVISION

IN RE: ADOPTION OF C.M.T.C      )        No.: 8 of 2017

                              )

(Born 12/ ./2007)            )        App. Ct. Case No. 81 WDA 2018

### RULE 1925(a) OPINION

AND NOW, this 1st day of February, 2018, pursuant to Pa.R.A.P. 1925(a)(2)(ii), the Court files the herein Rule 1925(a) Opinion in response to the Notice of Children's Fast Track Appeal and Concise Statement of Matters Complained of on Appeal filed in the above captioned matter on January 2, 2018, by M.C. ("Father") and C.C. ("Stepmother"), natural father and stepmother, respectively, of the above captioned adoptee, C.M.T.C., born December    , 2007 ("Child"). On January 18, 2017, Father and Stepmother filed their Petition for Involuntary Termination of Parental Rights ("TPR Petition"), which sought to terminate the parental rights of Child's natural mother, H.C. ("Mother"), pursuant to 23 Pa.C.S.A. § 2511 (a)(1) and (2). Following one day of trial on October 19, 2017 ("Trial"), by Opinion and Order of Court dated December 4, 2017 ("TPR Opinion and Order"), this Court denied the TPR Petition. The Court hereby incorporates its TPR Opinion and Order and files this Opinion in further support.

### FINDINGS OF FACT

Based upon the testimony and evidence presented at Trial, the Court makes the following findings of fact:

1. The Child was born on December   , 2007, and at the time of Trial was nine (9) years old. Until approximately May 2010, the Child lived with his maternal grandmother and grandfather, respectively, A.H. ("Maternal Grandmother") and T.C. ("Maternal Grandfather") (collectively, "Maternal Grandparents"). (Evidentiary Hearing Tr. 44, 102, 144, Oct. 19, 2017).

2. In May 2010 a custody Order of Court dated May 20, 2010 ("2010 Custody Order") was entered granting Father sole legal and primary physical custody of the Child and

1



granting Mother partial physical custody as agreed upon by the parties, supervised and facilitated by Maternal Grandmother.

3. Father and Stepmother began dating in 2013, began living together in Father's home in 2013 2014, and they married in September 2014. Stepmother's was introduced to the Child in December 2013, at which time she immediately took on a parental role with the Child. (Id. at 45)

4. Father and Stepmother first sought and received legal advice for pursuing termination of Mother's parental rights in 2014. Father and Stepmother filed their TPR Petition on January 18, 2017. (Id. at 47).

5. While the Child lived in Father's home, Mother had regular visitation with the Child, once a week or once a month, from June 2011 through April 2013, after which time Father stopped permitting Mother to have visits with the Child. (Id. at 39, 50-51, 58-59).

6. Mother's last visit with the Child was in 2014, (Id. at 39:24- 40:3, 41:1-4), after which Father did not permit Mother to have visitation because Mother did not provide him with "proper documentation," which he testified included Mother's psychiatric and drug and alcohol evaluations as referenced in the 2010 Custody Order. (Id. at 40, 55:14-56:7, 58-59); (Petitioners' Ex. A, Order of Court dated May 20, 2010).

7. The 2010 Custody Order directed Mother to provide Father with a certificate of her successful completion of an anger management program. No other documentation was ordered to be provided to Father, and Mother's periods of supervised custody were not made contingent upon the provision of any documentation. (Id.). As such, Father's limitation of Mother's contact with the Child, starting in 2014, was in violation of the express terms of the current custody order.

8. Until January 2017, the Child had a close relationship and regular visitation with Maternal Grandparents and, through them, Mother was able to maintain some level of contact with the Child. Mother's last physical contact with the Child was around February 2014, after which, Mother was able to maintain her relationship with the Child by mail and telephone contact through Maternal Grandparents and their regular visitation with the Child. Mother's last effectual mail and telephone contact with the Child, as discussed more fully below, occurred during the six month period immediately preceding Father and Stepmother's filing the TPR Petition in January 2017. (Evidentiary Hearing Tr. 183-185, Oct. 19, 2017).

9. During the six months immediately preceding filing of the TPR Petition, Father and Stepmother actively sought to prevent Maternal Grandparents from facilitating any contact between the Child and Mother while the Child was in Maternal Grandparents' care. During this time, Father became increasingly more adamant and threatening with them over his stringent condition for their contact with the Child that they not allow *any contact* between the Child and Mother. Father's increasingly threatening tone with them caused them to limit Mother's contact with the Child in the six months before the TPR Petition was

2

filed, and specifically caused Maternal Grandmother and Mother not to request visitation for Mother as provided by the 2010 Custody Order during this time. (Id. at 190).

10. Father has not permitted Maternal Grandparents to see the Child since their last contact in January 2017. (Id. at 65).

11. Maternal Grandparents' connection with the Child was an important part of the Child's life prior to the filing of the TPR Petition, as Father readily admitted at Trial. Father's apparent offer to enter into an Act 101 agreement with Maternal Grandparents signifies that he continues to believe that their continued relationship with the Child is important for the Child.

12. Just prior to the six month period, Mother sent the Child a card on June 22, 2016. (Petitioners' Ex. C, Letter to Cory Postmarked June 22, 2016). Stepmother withheld this card from the Child because she deemed it inappropriate. (Id. at 76). Mother's note to the Child in the card read in pertinent part, "I don't call you son because you shine . . . I call you son because you're mine!" Mother's card was appropriate in the context of Mother's regular contact and relationship with the Child; Stepmother's withholding of the card was inappropriate. (Id. at 121).

13. In the six months immediately preceding Father and Stepmother's filing their TPR Petition:

   a. Mother regularly spoke with the Child over the phone while the Child was visiting Maternal Grandparents until October 2016, (Id. at 118-119);

   b. Mother sent one (1) to two (2) letters per month for the Child to Maternal Grandmother, which Maternal Grandmother would read to the Child, (Id. at 175-76, 199, 206:6-8); and,

   c. Mother called the Child directly on his birthday on December ·, 2016. (Id. at 120, 140, 212, 215).

14. Mother sent letters directly to the Child since the TPR Petition was filed and Father withheld them all from the Child. (Id. at 53).

15. Based upon the Court's observations of Father and Stepmother during Trial, Father was relatively indifferent to the proceedings compared to Stepmother, who appeared more intensely interested in the outcome.

16. Based upon the parties' testimony at Trial and the Court's observation of the parties, the Court finds that Father and Stepmother's efforts since 2014, initially, to limit Mother's contact with the Child, and ultimately, to eliminate it altogether were designed to manipulate the circumstances in view of a preplanned effort to terminate Mother's parental rights.

3

17. Four (4) months prior to Trial, in June 2017, the Child indicated that he missed his mother "a lot"; this after not having phone or mail contact with Mother for approximately six (6) months. (Id. at 22, 24-25). At the time of Trial, however, the Child testified that he does not miss his mother, and that she is a "liar." (Id. at 17). The Child testified that he jealous of his stepsister, Stepmother's daughter, "because she sees her dad every two weeks." (Id. at 15-16). *See also* (Id. at 233:10-16). The Child further testified that he is not allowed to talk with or see Mother, because Father, as the Child understands, wants to protect him from Mother. (Id. at 19).

18. Mother has overcome her drug addiction, having credibly testified that she last used drugs in June 2016. (Id. at 146). Mother has made substantial progress in improving herself and her condition. Throughout Mother's drug use and recovery, the Child has been stably and safely cared for, first in Maternal Grandfather's home in the Child's first two years and thereafter in Father's home.

19. Father and Stepmother's asserted motives for seeking termination of Mother's parental rights are, first, to allow the Child to remain in his present home should Father unexpectedly pass away, and second, to allow the Child to inherit from Stepmother and Stepmother's family and to do so without the payment of the additional inheritance taxes which may be due and owing upon bequest or devise to a non-lineal descendent. These asserted motives appear to the Court to be more pretexts than actual motives, in part because they can be achieved by means short of termination, as more fully set forth in the Court's TPR Opinion and Order.

## DISCUSSION

In addition to the facts set forth above and the factual analysis provided within this Court's TPR Opinion and Order, and in consideration of the law as set forth therein, the Court offers the following additional analysis in support of its denial of Father and Stepmother's TPR Petition under sections (a)(1), (a)(2) and (b) of § 2511.

### Section 2511(a)(1)

Pursuant to the law of this Commonwealth, the focus of subparagraph (a)(1) analysis must be on Mother's conduct over at least the six months immediately preceding the filing of the TPR Petition, i.e., July 18, 2016 through January 18, 2017, to determine whether the facts clearly evidence Mother's settled purpose to relinquish her parental claim or her failure to perform parental duties.

4

In this analytically critical six month period, Mother called the Child on his birthday, she spoke with him regularly up through October 2016 while he was visiting Maternal Grandparents, and she sent one (1) to two (2) letters per month for the Child to her mother to read to the Child during their visits. All this was done while Father and Stepmother actively sought to prevent Mother's contact with the Child in violation of the 2010 Custody Order. Mother's efforts to maintain her relationship with the Child during this six month period clearly and convincingly evidence that Mother did not have a settled purpose of relinquishing her parental claim or refuse or fail to perform parental duties.

Appellants complain on appeal that this Court erred "by considering Mother's conduct and efforts to have contact with the [C]hild and/or the efforts of Mother to improve her life which occurred *after* the filing of the [TPR Petition]." (Appellants' Concise Statement of Matters Complained of on Appeal ¶ 7, Jan. 2, 2018). This error complained of asserts violation of the analytical timeframe restrictions imposed by § 2511(b), which reads in pertinent part:

> With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are *first initiated subsequent to the giving of notice of the filing of the petition.*

23 Pa.C.S.A. § 2511(b). In the present case, based on this express statutory language, the Court is only restricted from considering Mother's post-petition conduct within its analysis of Father and Stepmother's TPR Petition pursuant to subparagraph (a)(1). However, as shown by the emphasized statutory language above, this analytical timeframe restriction does not apply to Mother's efforts to remedy the conditions Petitioners' asserted in support of subparagraph (a)(1), which were first initiated before, and merely continued after, the filing of the TPR Petition.

In previously analyzing subparagraph (a)(1), the Court noted (1) that Mother sent letters to the Child after the TPR Petition was filed and (2) that Father withheld all of these letters from

5

the Child. First, while the Court noted that Mother sent post-petition letters, that fact was not relied upon for the Court's ultimate conclusions. Instead, it was only necessary for the Court to note Mother's post-petition letters in order to consider the fact that Father withheld them from the Child. Assuming *arguendo* that Mother's post-petition letters did form a basis for the Court's decision, these post-petition contacts were merely a continuation of Mother's activities initiated before the filing of the TPR Petition.[1] Mother consistently and regularly sent the Child letters. And although Mother sent these letters through Maternal Grandmother previously, that she started sending them directly to the Child at Father's home after filing of the TPR Petition is of no consequence, particularly as the change in location where the letters were sent is easily explainable by Father's actions in cutting off the Child from Maternal Grandparents around that same time. The fact that Father withheld Mother's post-petition letters is not excluded by subparagraph (b)'s restriction either, because it is Father's conduct, not Mother's.

From the evidence, it is clear that Mother could have done more to protect her relationship with the Child, in particular by taking legal action to enforce the 2010 Custody Order. However, Father cannot disregard a custody order over an extended period of time and then use the conditions created by that disregard to facilitate termination of Mother's parental rights and adoption by his new wife. During the critical six-month period immediately preceding filing of the TPR Petition, Mother regularly and consistently contacted the Child, in a manner sufficient to maintain her parental relationship with the Child and to continue to hold a place of importance in his life. Accordingly, this Court found that Petitioners failed to meet their burden

---

[1] *See*, In re D.W., 856 A.2d 1231, 1235 (Pa. Super. 2004) ("parent's actions in *K.C.W.* to correct the problems in her home were *initiated prior to* the filing of the termination petition and continued beyond the petition date"). *See also*, In re Adoption of A.C., 162 A.3d 1123, 1129 n.1 (Pa. Super. 2017) ("post-petition evidence concerned Father's ongoing visits with Child, which is evidence of continuing conduct that was initiated before the filing of the original petition.")

6

of proof in conjunction with the statutory requirements of § 2511 (a)(1) by clear and convincing evidence.

## Section 2511(a)(2)

The focus of the Court's analysis under § 2511 (a)(2) in this case is on whether Mother's actions constitute a "repeated and continued incapacity, abuse, neglect or refusal of the parent" that has caused the Child to be "without essential parental care, control or subsistence necessary for his physical or mental well-being" and whether those "conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S.A. § 2511 (a)(2). At Trial, Mother's credible testimony and demeanor persuasively convinced this Court that Mother has substantially progressed in and demonstrated recovery from drug addiction and abuse. Further, the Child has never been left without essential parental care, control or subsistence necessary for his physical or mental well-being; when Mother was unable to provide it as a result of her drug and alcohol abuse, Father and Maternal Grandparents were available and provided for the Child.[2] In making the decision to move away from the Child in order to recover from her addiction, Mother knew and reasonably relied upon the fact that the Child would be well provided for by Father and that she would be able to maintain her relationship with the Child through her parents while she recovered. Since that decision, Mother has remedied her substance addictions and fulfilled her parental duties to the Child by maintaining continual contact with the Child until Father and Stepmother were able to wholly thwart Mother's efforts to maintain contact just prior to filing their TPR Petition.

---

[2] *See*, In re Adoption of Farabelli, 333 A.2d 846, 850 (Pa. 1975) (Superior Court affirmed trial court's denial of termination of a father's parental rights pursuant to the statutory precursor to subparagraph (a)(1), where the trial court found that the father "adequately discharged his parental dut[y] . . . by permitting her to remain with her grandparents who, to his certain knowledge, would (and have) provided excellently for her upbringing.").

7

When Mother left the Child in Father's care in order to recover from her substance addiction, she knew that the Child would be provided for and that she could maintain a place of significance in his life through her parents. Mother did recover from her addiction and did maintain her relationship with the Child despite Petitioners' efforts until they filed the TPR Petition and cut Mother off entirely from the Child. As such, the conditions or causes of Mother's previous incapacity, abuse, neglect or refusal have been remedied and the only parental refusal has been on the part of Father to allow Mother contact with the Child. And so, termination of Mother's parental rights is unwarranted pursuant to subparagraph (a)(2).

### Section 2511(b)

Under subsection (b), the Court must consider the "developmental, physical and emotional needs and welfare of the child." The Child had a close relationship with Maternal Grandparents until January 2017. Through them, Mother maintained a close relationship with the Child until Father aggressively demanded within the six (6) months preceding filing of the TPR Petition that such contacts cease, which efforts were successful after Mother's last phone contact through Maternal Grandparents around October 2016. As of June 2017, five (5) months after the filing of the TPR Petition, six (6) months after Mother's last contact with the Child, and over three (3) years after last seeing Mother, the Child testified that he missed his mother "a lot." Only four (4) months later, however, the Child inexplicably testified that he did not miss his mother, and that she was a "liar." The Child's explanation for this change was that in the intervening period he considered that he had not seen Mother in three (3) years. However, the Child further testified that he was not allowed to talk with his mother because his father wanted to "protect him" from her. Considering the evidence as a whole, it is clear to this Court that the Child's feelings changed as a result of not having contact with Mother after December 20, 2016,

8

or with Maternal Grandparents after January 2017, and due to Father's deliberate thwarting of Mother and the Child's relationship, including by direct attempts at alienation.

Based on the Child's testimony, it was not until late in the third year of Mother's absence that the Child's resulting hurt overcame his desire to have Mother in his life. Based on the testimony and evidence presented at Trial, the Court finds that Father and Stepmother's obstructive conduct is primarily to blame for this change in the Child and the recent damage to his bond with Mother. As such, the Court finds that termination of Mother's parental rights is not in the Child's best interests as it would strip the Child of the beneficial relationship that he has with Mother and her family, relationships which the Court believes have been and will continue to be beneficial to the Child.

## CONCLUSION

As set forth more fully in its TPR Opinion and Order, based on Father and Stepmother's demeanor and behavior throughout Trial, this Court found that Stepmother was much more intensely interested in the proceeding and its outcome than Father. That observation, along with consideration of the timing of Father and Stepmother's actions seeking legal advice regarding termination of Mother's parental rights, and Father's actions limiting Mother and Maternal Grandparents' contacts with the Child, left this Court with concerns that Father's actions were not undertaken in the best interests of the Child.

Mother's substance abuse and addiction did have negative impacts on the Child. Mother, however, appears to recognize those impacts and has exerted herself to mitigate the damage and foster an appropriate relationship with the Child. Father and Stepmother, on the other hand, while having *de facto* sole custody of the Child, "erected barriers intended to impede free communication and regular association" between Mother and the Child, making it as difficult as

9

possible for Mother to exercise her custodial rights under the 2010 Custody Order. In re B..N.M., 856 A.2d 847, 855-56 (Pa. Super. 2004).

Despite these barriers, Mother was able to maintain a relationship with the Child throughout her recovery by phone and mail contact prior to the filing of the TPR Petition.

All-in-all, the Court was persuaded by the parties and the evidence that Mother's failure to do more to take and maintain a *greater* place of importance in the Child's life, was partially explained and more than outweighed by Father and Stepmother's obstructive behavior aimed at thwarting Mother's maintenance of a parental relationship with the Child, which cannot and "certainly [does] not provide a sound basis for the involuntary termination of [Mother's] parental rights." In re Adoption of B.D.S., 431 A.2d at 208.

**BY THE COURT:**

Timothy A. Krieger, Judge

cc: Heidi D. Norton, Counsel for Appellants – 11 N. Main Street, Greensburg, Pennsylvania 15601
Zachary I. Mesher, Counsel for Appellee – 123 S. Second Street, West Newton, PA 15089
Michael G. Dailey, Counsel for Child – 4373 Old William Penn Highway, Murrysville, PA 15668
Patricia L. Elliott-Rentler, Esquire, Guardian ad Litem – 414 S. Maple Avenue, Greensburg, PA 15601
Carol Petrusky, Civil Court Administrator

10